UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SYNTAX-BRILLIAN CORPORATION, *et al.*, | Case No. 08-11407 (BLS) |
| | Jointly Administered |
| Debtors. | |

| | |
|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SYNTAX-BRILLIAN CORPORATION, | |
| Plaintiff, | |
| v. | Adv. Pro. No. _____ |
| JAMES LI a/k/a CHING HUA LI, THOMAS CHOW a/k/a MAN KIT CHOW, MICHAEL K. CHAN, VINCENT F. SOLLITTO, JR., WAYNE A. PRATT, JOHN S. HODGSON, DAVID P. CHAVOUSTIE, MAX FANG, CHRISTOPHER C. LIU, YASUSHI CHIKAGAMI, SHIH-JYE CHENG, | |
| Defendants. | |

The Official Committee of Unsecured Creditors of Syntax-Brillian Corporation, *et al.* (the "Creditors' Committee"), as and for its claims for relief against the above-captioned defendants, alleges as follows:

## NATURE OF THE CASE

1.      This action asserts claims against former directors and officers of Syntax-Brillian Corporation ("SBC" or "the Company") for breaches of their fiduciary duties to SBC.  Defendants James Li, Thomas Chow and Michael Chan managed SBC for the benefit of the Company's principal supplier, Taiwan Kolin Co. Ltd ("Kolin"), and others,

resulting in (a) massive transfers of cash out of the Company without any legitimate basis or value in return, and (b) a loan to the Company that it could not possibly, and did not, repay.  The other defendants who were officers of SBC permitted this to occur, and the defendants who were directors ignored red flags that made clear that controls at SBC were inadequate and that Li, Chow and Chan were not acting in accordance with their duties of loyalty or care.  In fact, instead of taking effective measures to assure that SBC's systems more carefully controlled Li's activities and/or that Li was disciplined, the defendants who were directors expanded his authority and effective autonomy by promoting Li to CEO.

2.      As a result of the breaches of fiduciary duty described above and herein, SBC suffered damages in an amount in excess of $300 million.

## STATUS OF THE CASE & JURISDICTION

3.      On July 8, 2008, SBC and the other debtors and debtors-in-possession in this case (collectively, "the Debtors") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Plaintiff Creditors' Committee was formed by the United States Trustee for Region 3 on July 16, 2008, pursuant to Section 1102(a)(1) of the Bankruptcy Code.

6.      An examiner ("the Examiner") was appointed in the Debtors' Chapter 11 cases on August 22, 2008 and provided a report to the Court on October 6, 2008.

7.      This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding is proper under 28 U.S.C. §1409.

8.      This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

### PARTIES

9.      Debtor SBC is incorporated in Delaware with its corporate headquarters in Tempe, Arizona and offices in City of Industry, California.  SBC was the result of a merger ("the Merger") between Brillian Corporation ("Brillian") and Syntax Groups Corporation ("Syntax"), which was completed on or about November 30, 2005.

10.     Plaintiff Creditors' Committee received standing to prosecute the claims asserted in this Complaint through an Order of this Court dated November 25, 2008.

11.     Defendant James Li a/k/a Ching Hua Li ("Li") is a resident of Claremont, California.  Li was a founder, director and the President and Chief Executive Officer of Syntax.  Upon the Merger, Li became a director and the President and Chief Operating Officer of SBC.  Effective October 1, 2007, Li became President and Chief Executive Officer of SBC.  Li was placed on an indefinite leave of absence effective June 4, 2008. He resigned as a director effective June 30, 2008.  The Company Board of Directors terminated Li's employment as President and Chief Executive Officer effective July 2, 2008.

12.     Defendant Thomas Chow a/k/a Man Kit Chow ("Chow") is a resident of Covina, California.  Chow was a founder, director and Chief Financial Officer of Syntax. Upon the Merger, Chow became a director, Executive Vice President and Chief

Procurement Officer of SBC.  Chow resigned as an officer of the Company effective April 18, 2008 and resigned as a director effective May 28, 2008.

13.     Defendant Michael K. Chan ("Chan") is a resident of Walnut, California. Chan was Chief Operating Officer of Syntax.  Upon the Merger, Chan became Executive Vice President of North American Operations.  Effective September 10, 2007, Chan became Executive Vice President and Corporate Secretary.  Chan resigned as Executive Vice President effective April 18, 2008 and was removed as Corporate Secretary shortly thereafter.

14.     Defendant Vincent F. Sollitto, Jr. ("Sollitto") is a resident of Scottsdale, Arizona.  Sollitto was a director and the President and Chief Executive Officer of Brillian.  Upon the Merger, Sollitto continued as a director and the Chief Executive Officer of SBC.  Effective October 1, 2007, Sollitto became Executive Chairman of the Board of Directors and was no longer Chief Executive Officer.  Sollitto resigned effective June 30, 2008.

15.     Defendant Wayne A. Pratt ("Pratt") is a resident of Chandler, Arizona. Pratt was a Vice President and the Chief Financial Officer, Secretary and Treasurer of Brillian and retained those titles and positions after the Merger.  Pratt resigned effective September 30, 2007.

16.     Defendant John S. Hodgson ("Hodgson") is a resident of Tempe, Arizona. Hodgson was a director of Brillian and continued as a director of SBC upon the Merger. Upon the Merger, Hodgson also became Chairman of the Audit Committee of the Board of Directors of SBC ("the Audit Committee").  Effective October 1, 2007, Hodgson became Executive Vice President, Treasurer and Chief Financial Officer of SBC and was

no longer a member of the Audit Committee.  Hodgson resigned from all of his positions with the Company effective March 24, 2008.

17.    Defendant David P. Chavoustie ("Chavoustie") is a resident of Charlotte, North Carolina.  He was a director of Brillian and then SBC at all relevant times. Chavoustie was a member of the Audit Committee from the Merger until his resignation from all positions with the Company, effective June 30, 2008.

18.    Defendant Max Fang ("Fang") is a resident of Taiwan.  He became a director of the Company upon the Merger.  Fang was a member of the Audit Committee from the Merger to his resignation from all positions with the Company effective June 30, 2008.

19.    Defendant Christopher C. Liu ("Liu") is a resident of Taiwan.  He became a director of SBC upon the Merger.  He was the chairman of the Audit Committee from September 30, 2007 through November 7, 2007.  Liu at all relevant times was the President of defendant Taiwan Kolin Co. Ltd.  Liu resigned as a director of the Company effective May 30, 2008.

20.    Defendant Yasushi Chikagami ("Chikagami") is a resident of Taiwan. Chikagami was a director of Syntax.  Upon the Merger, he became a director of SBC. Chikagami resigned as a director of the Company effective June 30, 2008.

21.    Defendant Shih-Jye Cheng ("Cheng") is a resident of Taiwan.  Cheng became a director of the Company upon the Merger.  He resigned as a director of the Company effective June 5, 2008.

**FACTS**

22.     Prior to the Merger, Brillian was a public company based in Tempe, Arizona, which designed and developed large-screen, rear-projection high definition televisions ("HDTVs") using its proprietary LCoS (liquid crystal on silicon) technology. Syntax was a privately held company based in City of Industry, California.  Syntax, unlike Brillian, appeared to have developed a supply chain, a successful brand – Olevia – for its LCD (liquid crystal display) HDTVs, and a growing stream of revenues.  The Merger provided Brillian with the benefits of Syntax's business and provided Syntax with the benefits attendant to a public company.  Majority ownership (approximately 70%) of the combined company went to the former Syntax shareholders, including Li, Chow and Chan.

**Lack of Financial Controls**

23.     After the Merger, the former Brillian business continued to be operated out of Tempe, and the former Syntax business continued to be operated out of City of Industry by Li, Chow and Chan.  The City of Industry location retained, in Li's words, "total control of the cash movements" in and out of the old Syntax, despite the fact that neither Li, Chow, Chan, nor the on-site controller in City of Industry, former Syntax controller Alice Phang ("Phang"), had experience or understanding of the demands of a public company environment.  In substance, Chow remained the CFO of the City of Industry location and thus of the substantial majority of the Company's business.  Thus, for example, Syntax's (and upon the Merger, the Company's) relationship with Preferred Bank, with which the Company had a large credit facility, continued to be managed by

Chow, Phang and others at the City of Industry location, who exercised authority to draw on the facility and cause Preferred Bank to make disbursements on the Company's behalf.

24.     The risks of permitting Li, Chow and Phang to have unfettered control over cash movements in and out of the old Syntax business became apparent to the Audit Committee at least as early as the summer of 2006.  In or about July 2006, SBC paid Epoch $6,000,000 for equipment for a "clean room" and $5,500,000 for a five-year license to use technology and expertise associated with the clean room ("the Epoch Transaction").  The clean room duplicated equipment that SBC already had, which was adequate at the time and for the foreseeable future, and the license covered technology that SBC already owned.  The price of both the equipment and the license was grossly inflated.  The Epoch Transaction was negotiated and structured solely by City of Industry personnel, particularly Li and Chan, and the transaction was consummated with the assistance of Phang and the knowledge and/or assistance of Chow.  The finance department of SBC in Tempe learned about the Epoch Transaction after the fact, when the accounting records showed an increase in fixed assets.

25.     The Epoch Transaction came to the attention of the Audit Committee at their meeting of August 15, 2006 (also attended by Sollitto and Pratt), in which the Committee expressed its disapproval of the way in which the transaction came about and its concern over the authority assumed and exercised by Li.  Nevertheless, even in the face of this information, the Company neither adopted nor implemented any effective measures to curtail the authority of Li or Chow or to provide effective oversight.  Neither Sollitto nor Pratt caused SBC to adopt or implement such measures, and the Board did

not take steps to assure that appropriate systems, policies, procedures or controls were in place.

26.     On information and belief, at least one SBC board member, in addition to the members who were on the Audit Committee, knew about the Epoch transaction before it was completed:  Chikagami, who on information and belief was affiliated with Epoch.

**Lack of Control over Business Relationships**

27.     Sollitto and Pratt permitted Li and Chow to assume responsibility for managing the Company's relationship with Kolin, SBC's principal supplier of Olevia HDTVs and manager of the supply chain for that product.  Li and Chow assumed responsibility for obtaining "price protection" rebates (the "Price Protection Rebates"), a term used to describe a credit or non-cash rebate provided by Kolin to SBC on a quarterly basis.  The rebate reduced SBC's cost of goods sold, thus increasing its gross margin.

28.     "Price protection" from Kolin to SBC had no objective basis.  The "Price Protection Channels Agreement" between Kolin and SBC, as amended in July 2006, provided that the amount would be "based on market situation."  In practice, the process in general worked as follows:  at the end of a quarter, Li or Chow would ascertain, sometimes from Pratt, what amount of rebate would enable SBC to reach quarterly gross margin levels it had forecast to the marketplace.  At the end of each quarter, Li or Chow would then tell Kolin the amount of Price Protection Rebates SBC needed in order to show the profit margin that SBC required, and Kolin would provide the credits sufficient to reach that level.

29.     For example, toward the end of the first quarter following the Merger, Chow wrote to Phang:  "My current idea is make up to $1M net profit."  He instructed Phang to find out from Pratt "whether $1M is enough or not for this quarter," adding, "You will let him know Kolin will support us to sign the credit that we need."  Pratt responded by providing Phang, Li and Chow with profit and loss information for the Company.

30.     Pratt, Sollitto, Liu, Hodgson and the Audit Committee knew or should have known that the Price Protection Rebates had no basis other than "the credit that we need" to make the Company's earnings and margin appear satisfactory.  The other directors should have known that this was the case, but like Pratt, Sollitto, Liu, Hodgson and the Audit Committee, they turned a blind eye to the facts.  In addition, Pratt, Sollitto, Liu and Hodgson knew or should have known that Kolin was under no obligation to provide Price Protection Rebates in any particular amount and that the rebates could cease at any time.  Pratt and the Board also knew the approximate size of Kolin's share ownership of SBC at all relevant times, which peaked at 12.5% as of June 30, 2006 and diminished to 5.7% of as of June 30, 2007.

31.     Absent the Price Protection Rebates, SBC was not a profitable or viable business at any time.

32.     The Company's lack of adequate controls over cash movements and over the business relationship with Kolin came together to cause millions of dollars of improper cash transfers to be made to Kolin from SBC via the City of Industry location. Kolin had a practice of invoicing SBC for "tooling":  that is, the molds used in manufacturing the plastic frames around the HDTVs that SBC ordered from Kolin.  As

Sollitto publicly stated, and as set forth in a written agreement between Kolin and the Company, Kolin's invoices represented a charge for molds that would be amortized over the purchase of units.  The invoices were not intended to generate up-front, cash payments.  Nevertheless, beginning in December 2006, Phang, under the direction of Chow, began causing millions of dollars to be transferred to Kolin based on the tooling invoices, as purported payments for tooling.  The following table shows the date of each invoice for tooling from Kolin, the dates of payment by SBC, and how much SBC paid, all at the direction of Chow and with the approval of Li:

| **Date of Invoice** | **Date of Payment** | **Amount** |
| --- | --- | --- |
| July 8, 2006 | December 15, 2006 | $22,129,090 |
| December 12, 2006 | July 5-27, 2007 | $20,389,779 |
| May 7, 2007 | Aug. 9-Sept. 7, 2007 | $39,878,513 |
| August 17, 2007 | Oct. 4-Nov. 26, 2007 | $60,072,300 |
|  | TOTAL: | $142,539, 674 |

33.     The transfer of $142.5 million to Kolin from SBC served at least two purposes for Kolin.  First, it provided Kolin – or some ultimate recipient unknown at this time to plaintiff – with cash.  Second, on information and belief, it enhanced the ability of Kolin to obtain financing for its business.

34.     For SBC, however, the transfer was simply a waste of corporate assets. As Chow and Li knew, and as Pratt, Sollitto, Hodgson and Liu knew or should have known, the funds that were being transferred to Kolin ostensibly for tooling were not in fact for tooling, nor was there $142 million worth of tooling that SBC actually owned.[1] Rather, the funds were being sent to Kolin solely to serve Kolin's interests, not SBC's. Pratt, Sollitto and Liu knew or should have known that funds were being transferred to

---

[1] In the case of Pratt, who resigned effective September 30, 2007, this allegation relates to $82.5 million of the payments.

Kolin based on the tooling invoices, that this was improper, and that the transfer of cash was without consideration.

35.     The Board had information that Li and Chow were exercising authority over cash flow and the Kolin relationship without proper systems, policies, procedures or controls in place.  Ultimately, the Board ignored this information.  On September 6, 2007, Hodgson reported to the Board that at the end of June, the City of Industry location had effected a cash advance of $17,800,000 to Kolin without the knowledge of Sollitto or Pratt.  Within days of receiving this information, the Board appointed Li CEO, despite the fact that Li had been directly involved in the offending transfer.

36.     The control that City of Industry personnel exercised over business relationships led to another debacle for the Company, concerning South China House of Technology, Ltd. ("SCHOT").  SCHOT, based in Hong Kong, was a distributor of SBC HDTVs in China.  The president of SCHOT, Stanley Chan, grew up together with Michael Chan and Chow in Hong Kong.  Chow owned 3.8% of SCHOT directly until all direct ownership was transferred to a British Virgin Islands corporation.

37.     For the fiscal year ended June 30, 2006, SBC's financial statements showed net sales to SCHOT of $32.4 million, or 16.8% of total net sales.  For the fiscal year ended June 30, 2007, net sales to SCHOT, according to SBC's financial statements, had climbed more than tenfold to $335.9 million, or nearly half of the Company's net sales.

38.     The difference in net sales recorded to SCHOT between the two years appears to have been related to the 2008 Olympics in China.  Li, Chow and Chan attempted to have Olevia HDTVs sold for use in the Bird's Nest and other venues related

to the Olympics, and attempted to use SCHOT and Olevia Far East ("OFE"), another

company purportedly based in Hong Kong, for that purpose.  OFE purported to own the

Olevia trademark in China.

39.     Accounts receivable from SCHOT grew to $164.5 million by April 2007,

declining slightly by September 30, 2007 but still comprising 55.6% of SBC's total

unassigned accounts receivable.  Similarly, accounts receivable from OFE grew to $56.1

million, or 25.4% of total unassigned accounts receivable, by the same date.  The credit

terms to SCHOT and OFE were exceptionally long and beyond industry standard, *i.e.*,

120 days.  In practice, these accounts receivable actually extended to almost 180 days

prior to June 30, 2007 before partial payment by SCHOT.  The reason for these generous

terms, on information and belief, was the relationship among Chow, defendant Michael

Chan, Stanley Chan, SCHOT and Kolin.   As Li advised Pratt in April 2007, Kolin owned

a substantial portion of SCHOT.

40.     The books and records of SBC reflected the sales to SCHOT and OFE at

levels relative to cost that resulted in gross margins of 20% to 50%.  This too was

substantially above industry standard.  On information and belief, the margin on

SCHOT's resale of the product was to be approximately 1%.

41.     SBC's transactions with SCHOT and OFE served to shift some of the

burden from Kolin of supporting SBC's gross profit margin through the Price Protection

Rebates, which in general diminished as the SCHOT and OFE sales and accounts

receivable grew.  On its face, the SCHOT and OFE transactions as reported therefore

enriched Kolin, while only appearing to enrich SBC.  Furthermore, any cash actually

received from SCHOT was transferred immediately to Kolin, at the direction of Li and Chow, who considered the cash to be Kolin's property.

42.     SBC failed to insure the accounts receivable of SCHOT or OFE, despite the fact that it insured domestic accounts receivable.

43.     Pratt, Sollitto and Hodgson knew or should have known that the excessively generous payment terms extended to SCHOT and OFE, and indeed the very existence of transactions between SBC and these entities, had to do with the relationships among the parties set forth above and the interests of Kolin rather than the creditworthiness of SCHOT or OFE.  Indeed, Pratt, Sollitto and Hodgson had no basis for believing that SCHOT or OFE would pay such large accounts receivable, and they had ample reason to scrutinize the Company's relationship with SCHOT and OFE based on the payment terms, the relationship with Kolin, the improbably large gross margins for SBC, and the growth of the receivables.  Nevertheless, neither Pratt, Sollitto nor Hodgson took effective steps to investigate or curtail the transactions with SCHOT or OFE, or to put adequate controls in place, and none of them caused SBC to obtain applicable insurance.

44.     The Board was aware of the receivables from SCHOT or OFE and the risks those receivables presented, but took no effective steps to assure that systems, procedures, policies or controls were in place to properly monitor and address those risks.

**The Silver Point Loan**

45.     On or about October 26, 2007, at the insistence of Li, SBC obtained a $150 million term loan ("the Loan") and a $100 million revolving line of credit from

Silver Point Capital, L.P. ("Silver Point").  SBC borrowed the $150 million immediately but did not draw on the line of credit.

46.     SBC's cash position and business practices as described above, as a result of the failure of Pratt and Sollitto to manage the business in accordance with their fiduciary obligations, the promotion of Li to CEO, and the failure of the Board to assure that appropriate systems, policies, procedures and controls were in place as their fiduciary obligations required, made SBC's default on the Loan a virtual certainty, absent some change in the practices or strategy of the Company.

**The Demise of SBC**

47.     On or about November 27, 2007, SBC entered into a royalty agreement with SCHOT and OFE, under which SBC granted OFE an exclusive license for the sale of Olevia HDTVs in Hong Kong and China and agreed to pay OFE a 3% royalty on each unit sold.  SCHOT would manage the calculations and collect the royalty fees for SBC and receive fees for these services.  Li negotiated this arrangement because although SCHOT and OFE had purchased large numbers of Olevia HDTVs, they had been unable to sell them for use in 2008 Olympic venues.

48.     As a result of the new arrangement with SCHOT and OFE, sales to them effectively ceased.  At or about the same time, however, Li (on information and belief, with the knowledge and/or participation of Chow and Chan) also negotiated an arrangement whereby SCHOT and OFE would return HDTVs to SBC and receive credit on their accounts receivable.  Pursuant to this arrangement, some HDTVs began arriving at the City of Industry warehouse in December 2007.

49.     At or about the end of December 2007, Li requested and received from Kolin a Price Protection Rebate that he believed would offset the cessation of sales to SCHOT/OFE and its negative impact on the Company's earnings and margins for the quarter ending December 31, 2007.  The amount of this Price Protection Rebate, which covered one quarter only, was approximately $60 million – more than the Price Protection Rebates for the entire prior fiscal year (or any other prior fiscal year).  The amount was unrelated to any actual "price protection" and served only to boost SBC's earnings and gross margin.

50.     Li caused the arrangement with SCHOT and OFE to be documented in an agreement on or about January 8, 2008 ("the Inventory Return and Conversion Agreement"), which provided that SCHOT and OFE would provide an inventory of the HDTVs ("Inventory" under the agreement) and "return the Inventory to SBC by shipping the Inventory to Kolin."

51.     SCHOT purported to return approximately 25,000 HDTVs.  Due to the foregoing agreement, fewer than half found their way to SBC's California warehouse.  Because of Li's gross negligence, his loyalty to Kolin at the expense of SBC, and the relationships of Chow and Michael Chan with SCHOT and Stanley Chan, Li never took steps to assure that a meaningful inventory was in fact provided or that SBC ever could ascertain that the bulk of the returned HDTVs actually were in SBC's control or even that they existed.  Indeed, Li discouraged Company personnel from ascertaining these facts.  Consequently, SBC credited SCHOT and OFE for the return of approximately 25,000 HDTVs against the outstanding accounts receivable per the Inventory Return and Conversion Agreement, leaving balances of $47,578,532 and $15,027,330, respectively.

Yet SBC did not receive, and to this day does not have, the bulk of the purportedly returned HDTVs. On information and belief, to the extent those HDTVs exist at all, they remain in the possession and control of Kolin and thus have served Kolin's interests rather than SBC's.

52.      At the same time (December 2007-January 2008) that Li was providing SCHOT and Kolin with arrangements that favored their interests over SBC's, Li continued to assure that all available cash was transferred to Kolin. Hodgson and Li knew that funds should have been set aside to assure that SBC would be in compliance with the borrowing base requirements of its Loan at the end of January 2008, but neither of them caused any such funds to be set aside. To the contrary, despite having transferred over $142.5 million in unnecessary "tooling" payments to Kolin, SBC transferred approximately $15 million to Kolin in January 2008, accelerating payment of invoices in order to do so. Consequently, on or about January 29, 2008, SBC defaulted on the Loan because it was more than $10 million out of compliance with borrowing base requirements. This in turn caused Silver Point to insist on certain controls over the flow of cash out of the Company. The practice of transferring cash to Kolin thus effectively ceased. Kolin then ceased providing Price Protection Rebates.

53.      The Loan default also placed Silver Point in a position to raise the interest rate on the Loan dramatically and to charge forbearance fees, resulting in further losses to SBC of over $10 million. Had the Company set aside cash rather than fallen over $10 million out of compliance with borrowing base requirements, these losses would not have occurred.

54.     In or about April 2008, SCHOT informed Sollitto that its agreement with SBC included various discounts, credits and rebates it had negotiated with Li. Stanley Chan, and later SCHOT's counsel, informed SBC that it owed SBC nothing and asserted that, to the contrary, SBC owed SCHOT several million dollars. At or about the same time, OFE also refused to pay its outstanding accounts receivable balance.

55.     In May 2008 Kolin, asserting that the relationship with SBC had shifted "ever since January 29, 2008," purported to retract approximately $80 million in Price Protection Rebates, in addition to other rebates. Kolin further asserted that it had never received any payments for tooling. In or about the following month, SBC learned that Kolin had not reflected the Price Protection Rebates on its own financial statements.

56.     When SBC and its affiliated debtors filed their bankruptcy petitions on July 8, 2008, SBC owed Silver Point approximately $112 million.

**Post-Petition Developments**

57.     On or about August 28, 2008, Kolin filed a proof of claim in this case, seeking approximately $271 million, primarily for alleged payments due for "goods sold and services performed."

58.     On October 16, 2008, the Examiner made his report to the Court. According to his report, the Examiner's investigation uncovered the Epoch Transaction and the fundamental basis of the instant proceeding: *i.e.*, that SBC was run for the benefit of one major shareholder, Kolin, whose interests were elevated above those of the Company, in violation of officers' and directors' duties of loyalty and care.

## COUNT I:
## BREACH OF FIDUCIARY DUTY
### (Defendants Li, Chow, Chan)

59.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 58 of the Complaint as if fully set forth herein.

60.     Defendants Li, Chow and Chan owed fiduciary duties of care, loyalty and good faith to SBC.  Defendants Li, Chow and Chan were required to use their abilities to control and manage SBC in a manner consistent with their fiduciary duties, to refrain from abusing their positions, and not to favor their own interests or those of their friends and others at the expense of SBC.  Defendants Li, Chow and Chan breached those duties.

61.     Defendants Li, Chow and Chan assured that SBC was run for the benefit of Kolin and other third parties, elevating the interests of Kolin and those parties over the interests of SBC, in breach of the duty of loyalty that defendants Li, Chow and Chan had toward SBC.

62.     Defendants Li, Chow and Chan knew that the Epoch Transaction was a waste of corporate assets and, on information and belief, that it was based on the relationship between Epoch and Chikagami rather than any legitimate business purpose.

63.     Defendants Li and Chow knew or should have known that approximately $142 million paid to Kolin on the basis of "tooling" invoices was without any legitimate business reason and was a waste of corporate assets.

64.     Defendants Li, Chow and Chan knew that the payment terms provided to SCHOT and OFE were unjustified by legitimate business considerations, that SCHOT and OFE had no outlet for SBC's products, and that permitting the SCHOT and OFE

accounts receivable to continue to build was reckless and put SBC at substantial, unreasonable risk of nonpayment.  Permitting the accounts receivable to build, and permitting the business relationship among SBC, Kolin, SCHOT and OFE to continue, was a breach of the fiduciary duties of defendants Li, Chow and Chan.

65.     Defendants Li and Chow knew or should have known that given the practices and strategy of SBC at the time of the Loan, the Loan would not be repaid, and either SBC should not have entered into the Loan at all or SBC should have ceased making improper cash advances to Kolin and set aside funds to achieve compliance with the Loan requirements.  Defendant Li knew or should have known that making unrequired payments to Kolin in January 2008, rather than setting aside cash to meet Loan requirements, would subject SBC to substantial damages and harsh consequences as a result of default on the Loan.

66.     Defendants Li, Chow and Chan knew or should have known that the return of the Inventory as it was executed did not adequately protect the interests of SBC, but instead favored the interests of Kolin, SCHOT and OFE over the interests of SBC, in violation of the fiduciary duties that defendants Li, Chow and Chan had toward SBC.

67.     By reason of the foregoing, SBC has been damaged in an amount in excess of $300 million.

## COUNT II:
## BREACH OF FIDUCIARY DUTY
### (Defendants Sollitto, Pratt, Hodgson)

68.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 67 of the Complaint as if fully set forth herein.

69.     As officers, defendants Sollitto, Pratt and Hodgson owed fiduciary duties of care, loyalty and good faith to SBC.  Defendants Sollitto, Pratt and Hodgson (for the period in which he was Chief Financial Officer) were required to use their abilities to control and manage SBC in a fair, just and equitable manner, to refrain from abusing their positions of control, and not to favor their own interests or those of their friends and others at the expense of SBC.  Defendants Sollitto, Pratt and Hodgson breached those duties.

70.     Defendants Pratt, Sollitto and Hodgson knew or should have known that because of the activities of defendants Li, Chow and Chan, SBC was being run for the benefit of Kolin and other third parties, elevating the interests of Kolin and those parties over the interests of SBC.

71.     Defendant Pratt knew, and defendant Sollitto should have known, that the Epoch Transaction was a waste of corporate assets.  Nevertheless, neither Pratt nor Sollitto took effective measures to control the flow of cash in and out of the City of Industry location, to curtail the authority exercised by Li or Chow over cash and business relationships, to prevent the Epoch Transaction or to have the Epoch Transaction reversed.

72.     Defendants Pratt, Sollitto and Hodgson knew or should have known that approximately $142 million paid to Kolin on the basis of "tooling" invoices was without any legitimate business reason and was a waste of corporate assets. Nevertheless, neither Pratt, Sollitto nor Hodgson took effective measures to control the flow of cash in and out of the City of Industry location, to curtail the authority exercised by Li or Chow over cash and business relationships, or to prevent the payments for "tooling."

73.     Defendants Pratt, Sollitto and Hodgson knew or should have known that the payment terms provided to SCHOT and OFE were based on breaches of fiduciary duties (by Li, Chow and Chan) rather than legitimate business considerations, that SCHOT and OFE were unable to sell SBC's products, and that permitting the SCHOT and OFE accounts receivable to continue to build was reckless and put SBC at substantial, unreasonable risk of nonpayment.  Nevertheless, defendants Pratt, Sollitto and Hodgson permitted the accounts receivable to build and, through their failure to exercise their fiduciary obligations, proximately caused the loss represented by over $62 million of uncollectible receivables.

74.     Defendant Hodgson knew or should have known that given the practices, and strategy of SBC at the time of the Loan, the Loan would not be repaid, and either SBC should not have entered into the Loan at all or SBC should have ceased making improper cash advances to Kolin and set aside funds to achieve compliance with the Loan requirements.  Defendant Hodgson knew or should have known that making unrequired payments to Kolin in January 2008, rather than setting aside cash to meet Loan requirements, would subject SBC to substantial damages and harsh consequences as a result of default on the Loan.

75.     Defendant Hodgson knew or should have known that the return of the Inventory as it was executed did not adequately protect the interests of SBC, but instead favored the interests of Kolin, SCHOT and OFE over the interests of SBC, in violation of the fiduciary duties that defendants Li, Chow and Chan had toward SBC.

76.     The actions and inaction of defendants Pratt, Sollitto and Hodgson as set forth above constitute gross negligence.

77.     By reason of the foregoing, SBC has been damaged in an amount in excess of $300 million.

## COUNT III:
### BREACH OF FIDUCIARY DUTY
**(Defendants Li, Sollitto, Hodgson, Chavoustie, Fang, Liu, Chikagami, Cheng ("the Director Defendants"))**

78.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.     The Director Defendants owed fiduciary duties of loyalty and good faith to SBC.  The Director Defendants had a duty to assure that appropriate information and reporting systems and adequate policies, procedures and internal controls were in place. The Director Defendants on SBC's Audit Committee had further responsibilities to ensure that adequate internal controls and reporting systems were in place and properly utilized, to inform their fellow Board members of significant issues in this regard and to initiate corrective action.

80.     The intentional ignorance and/or willful blindness of the Director Defendants to SBC's improper actions and systems failures constitute breaches of the fiduciary duties of these defendants to SBC.

81.     As a result of their conscious disregard of known risks attendant to SBC's failure to establish and enforce reliable internal controls and reporting systems, the Director Defendants failed to take action to assure that the Company had adequate financial controls and reporting systems.

82.     As a result of the Director Defendants' failure to assure the implementation of adequate internal controls and systems, at least $152 million of corporate assets were wasted, the Company lost over $62 million in uncollectible

accounts receivable, the Company failed to obtain the benefit of the Inventory return described above, and the Company incurred at least $150 million of debt that it did not have the resources to repay, of which $112 million remained unpaid at the time of the filing of the petition in this case.

83.     Defendant Liu, as President of Kolin and a director of the Company, breached his duty of loyalty to SBC by permitting SBC to be run for the benefit of Kolin's interests rather than SBC's, in the manner set forth above.  On information and belief, Liu had substantial holdings in Kolin and was enriched personally by his breaches of his duty of loyalty.

84.     On information and belief, defendant Chikagami breached his duty of loyalty by promoting and/or failing to prevent the Epoch Transaction.  On information and belief, Chikagami had a financial interest in Epoch and was enriched personally by his breach of his duty of loyalty.

85.     By reason of the foregoing, SBC has been damaged in an amount in excess of $300 million.

### COUNT IV:
### EQUITABLE SUBORDINATION
### (All Defendants)

86.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 85 of the Complaint as if fully set forth herein.

87.     To the extent any of the defendants herein asserts a claim against the Debtors' estate in the above-captioned cases, each such claim is subject to equitable subordination.

88.     Pursuant to Section 510(c) of the Bankruptcy Code, equity demands that the payment priority of any such claim by a defendant herein be changed to fall behind all other claims and interests.

WHEREFORE, Plaintiff respectfully respects the following relief:

a.   That this Court award damages against all defendants in an amount to be determined, but in excess of $300 million;

b.   That this Court award the plaintiff its attorney's fees and the costs of this action; and

c.   That this Court grant such other and further relief as it deems just and proper, including the equitable subordination, pursuant to 11 U.S.C. § 510(c), of any claims any of the defendants may assert against the estate of any of the debtors herein.

Dated: November 26, 2008

**ANTHONY OSTLUND BAER**
**LOUWAGIE & ROSS P.A.**
Joseph W. Anthony
John B. Orenstein (admitted *pro hac vice*)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone:  (612) 349-6969
Facsimile:  (612) 349-6996
Email:  jorenstein@aoblr.com

and

**PEPPER HAMILTON LLP**

/s/ David M. Fournier
David M. Fournier (DE No. 2812)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE  19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390
Email:  fournierd@pepperlaw.com

Counsel for the Official Committee of
Unsecured Creditors of Syntax-Brillian
Corporation, *et al.*